UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

In re:                                  }
VERONICA A. BAKER,                      }
                                        }    Case No. 08-42247-JJR-13
                    Debtor.             }

## MEMORANDUM OPINION

The following contested matters were filed in this case, and have come before the Court for consideration and disposition:

(1) Motion For Relief From Stay (Doc. 65) filed by First National Bank of Talladega (the "Bank");

(2) Bank's Motion For Relief From Co-Debtor Stay (Doc. 74), as to co-debtors Catherine Collins ("Mrs. Collins,""Wife" or "Mother") and Raymond Collins ("Mr. Collins" or "Father" and together with Mrs. Collins, "the Collins");

(3) Trustee's Objection to Motion For Relief From Stay (Doc. 129) filed by Linda Gore, the Standing Chapter 13 Trustee (the "Trustee"); and

(4) Trustee's Objection to secured status of Claim 10 of the Bank (Doc. 131).

The Court has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama. These are core proceedings pursuant to 28 U.S.C. § 157(b)(2); therefore, the Court has authority to enter final orders. In compliance with Rule 7052(a) of the Federal Rules of Bankruptcy Procedure, the following shall constitute the Court's findings of fact and conclusions of law.[1]

---

[1] All "Rule" references are to the Federal Rules of Bankruptcy Procedure.

An evidentiary hearing was held on the above matters on July 28, 2009, and continued on August 11, 2009. Thereafter each of the parties, including the debtor, Veronica A. Baker, who is the Collins' daughter (the "Debtor" or "Daughter"), filed a memorandum in support of their respective positions. (Collins' Memo Doc. 172; Debtor's Memo Doc. 173; Bank's Memo Doc. 174; Trustee's Memo Doc. 175). The Court considered the arguments of the parties and their authorities set forth in each of their memorandum in reaching its decisions.

## OVERVIEW

The adjudication of these contested matters will for all practical purposes determine who is entitled to a Certificate of Deposit in the amount of $33,703.64 (the "CD") that was issued by the Bank on May 22, 2008.[2] All parties admit Mr. Collins paid for the CD, but at his direction the CD was issued as a joint account in the names of Mrs. Collins and the Debtor. Mr. Collins's name does not appear on the CD.

Each of the parties asserts an interest in the CD: The Bank claims it has a right to set-off the CD against a prepetition debt owing by the Debtor. The Trustee argues the CD is property of the Debtor's bankruptcy estate under Section 541(a) of the Bankruptcy Code.[3] And Mr. Collins

---

[2] A copy of the CD was introduced into evidence as Bank's Exhibit A.

The Uniform Commercial Code as adopted by Alabama defines a certificate of deposit as "an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money. A certificate of deposit is a note of the bank." Ala. Code. § 7-3-104. Regardless of the extent the UCC may govern transactions involving certificates of deposit, unless displaced by the UCC, "principles of law and equity, including . . . the law relative to . . . estoppel, fraud, misrepresentation, . . . mistake, bankruptcy, and other validating or invalidating cause supplement its provisions." Ala. Code § 7-1-103.

[3] 11 U.S.C. § 101 *et seq*, and herein the "Code" or "Bankruptcy Code." All references to a "Section" are to a section, subsection or subdivision of the Code unless the context indicates

contends he is the owner of the beneficial and equitable rights to the CD. As expected, the Debtor supports her Father's position as does Mrs. Collins. Accordingly, the issue to be resolved by the Court is whose claim to the CD has priority over the others?

FINDINGS OF FACT

*Bank's Claim Against the Debtor*:

On September 29, 2000, the Bank loaned the Debtor $18,253.40 to finance her purchase of a 1997 Oldsmobile.[4] The Debtor defaulted and the Oldsmobile was repossessed and sold. The proceeds from the sale were applied to the loan, but the Debtor remained indebted to the Bank for a deficiency of $15,973.23.[5] There was no evidence of exactly when the default or the repossession occurred; however, the Debtor testified she thought the repossession occurred in 2002 or 2003. Nonetheless, the loan matured September 29, 2005; there was no evidence of an extension; and the deficiency remaining after the repossession was only $2,280 less than the original balance. The default must have occurred several months, if not years, before Mr. Collins purchased the CD. Thus, the loan deficiency was due and payable by the Debtor when the CD was issued.

---

otherwise.

[4] The loan was evidenced by an agreement entitled Simple Interest Note, Disclosure, and Security Agreement (the "Note"). A copy of the Note was introduced into evidence as Bank's Exhibit B.

[5] A proof of claim, as amended, was filed by the Bank in the amount of $15,973.23; claim 10 on the claims register. The Court assumes the claim included interest accrued to the petition date, plus costs of repossession and sale, which may account for why the claim was only $2,280 less than the original loan balance.

3

*Purchase and Issuance of the CD*:

Mr. Collins retired from Avondale Mills when it closed its facilities.[6] After he retired, he received a check from Avondale dated August 7, 2006 in the amount of $81,672.28 (the "Check").[7] The Check was earmarked: "Disbursement Reason: TERMINATION DISTRIBUTION."

According to a Hold Notice signed by the Bank's teller and Mr. Collins (designated in the Notice as the Bank's customer), the Check was deposited on August 14, 2006.[8] The teller's hand-written note at the bottom of the Hold Notice and a Loan Payment Receipt confirmed that $35,866.77 of the deposit was applied to pay-off a loan apparently owing by Mr. Collins. The remainder of the deposit, or at least an amount sufficient to purchase the CD, remained in Mr. Collins' account with the Bank until May 22, 2008 when the CD was issued at his request in the names of Mrs. Collins and his Daughter.

Mr. Collins testified that when he purchased the CD he was not in good health and was facing back surgery. The surgeon warned Mr. Collins there was a possibility he could be left paralyzed from the surgery. Mr. Collins was concerned that if he became incapacitated his Wife would not have access to his money to pay bills and family expenses. Mr. Collins stated he knew of several older people who put money aside that could be reached by a family member in case of a medical emergency. Indeed, Mr. Collins' father suffered an aneurysm but beforehand put money in an account his daughter was able to access to pay expenses while he was in the hospital. When

---

[6] It is common knowledge in this community that Avondale Mills closed its facilities in Alabama and terminated most of its employees.

[7] A copy of the check was introduced into evidence as Debtor's Exhibit 1.

[8] A copy of the Regulation CC: Hold Notice was included with Exhibit 1, as was a Loan Payment Receipt also dated August 14, 2006.

4

Case 08-42247-JJR13    Doc 178    Filed 11/17/09    Entered 11/17/09 15:52:28    Desc
Main Document    Page 4 of 18

asked why he had the CD issued in both his Daughter's and Wife's names, Mr. Collins replied that he and his Wife were in poor health,[9] they had very little education, and he trusted his Daughter.

Finally, Mr. Collins testified that he told the Bank's teller when he purchased the CD the reason he wanted it issued in the names of his Wife and Daughter:

> Ms. Hatcher: Were you giving the CD to your daughter?
> Mr. Collins: No, I made her understand and *the one at the bank* understand that I was just transferring it for use in an emergency. (emphasis added).
> Ms. Hatcher: And that was clearly related to your daughter, to your wife, and in front of the bank teller?
> Mr. Collins: Right.[10]

The Bank knew Mr. Collins was the source of the funds used to purchase the CD, and knew the reason he wanted his Daughter's name on the CD. There was no evidence that the Bank's teller or anyone else told Mr. Collins of his Daughter's defaulted loan at the time the CD was issued.[11] Mr. Collins retained possession of the CD after it was issued, and it was never in the possession of his Daughter.

### *The Debtor's Bankruptcy*:

On October 13, 2008, the Debtor filed a petition for relief under chapter 13 of the Bankruptcy Code. The Debtor's confirmed chapter 13 plan (Doc. 80) proposes to only pay secured creditors and administrative expenses; the plan does not propose to pay anything to the Bank.

---

[9] The Debtor testified that her mother had just received a pacemaker when her Father purchased the CD.

[10] No witness representing the Bank testified at the hearing.

[11] Mr. Collins was a credible witness, and none of the adverse parties attempted to discredit his testimony through cross-examination, rebuttal witnesses or otherwise. The Bank and the Trustee claim the CD based on legal theories, not because of any dispute in the facts.

5

The Debtor's original Schedule B and Statement of Financial Affairs did not mention the CD. On January 5, 2009, after the ownership of the CD became an issue, the Debtor amended her Schedule B and Statement of Financial Affairs. In the amended Schedule B the CD was described as "Dad's money - Debtor's name on it for emergency purposes only - $33,000." And in the amended Statement of Financial Affairs, Mr. Collins was named as the CD's owner.

In her testimony, the Debtor agreed with her Father's description of why the CD was acquired. She stated that until the controversy over the CD arose she did not believe she even knew her name appeared on it, and probably did not even know of its existence. She stated she never had possession of the CD, never made any withdrawals, and most significantly she did not remember signing any papers having anything to do with the CD.[12]

CONCLUSIONS OF LAW

*Bank's Right of Setoff*:

In its Memorandum (Doc. 174) the Bank conceded it does not hold a security interest in the

---

[12] During his testimony Mr. Collins made passing comments about signing something, such as "I had both of them to sign it," and a couple of other similar references; however, there was no evidence of what, if anything, his Wife and Daughter actually signed. No witness ever mentioned anything about a signature card being signed by the Debtor and no signature card was offered as evidence. When asked whether she signed anything relating to the CD, the Debtor testified as follows::

Mr. Carraway: Did you sign anything with your name on it as relates to CD?
Debtor: I don't remember signing anything.

Based on this evidence, the Court will not presume the Debtor signed a signature card that gave her the right to make withdrawals from the CD.

6

CD. That is, the CD was not voluntarily pledged as security for the Debtor's loan.[13] The Bank does allege, however, it holds a right of setoff with respect to the CD that has priority over the rights and claims of all other parties. In a bankruptcy case a creditor is usually entitled to a right of setoff when the creditor and the debtor have mutual debts owing one to the other.[14] The claim of such a creditor is treated as a secured claim to the extent of the amount of the setoff.[15] If the debt owing by a creditor exceeds the amount of its claim, the excess must be paid to the trustee under Section 542(b).[16] Thus, because the amount on deposit in the CD exceeds the amount owing on the Debtor's loan, if the Bank has a valid right of setoff, its claim should be treated as fully secured, and to the extent the CD is determined to be property of the estate, the balance after setoff would be payable to the Trustee.

When a case is commenced under any chapter of the Code, Section 362(a)(7) stays a creditor from exercising a right of setoff with respect to the debtor,[17] and in a chapter 13 case Section 1301(a)

---

[13]The Alabama Uniform Commercial Code specifically recognizes that a bank does not jeopardize its right of setoff by taking a consensual security interest in a deposit account. Ala. Code § 7-9A-340(b).

[14]Section 553 provides that, with certain exceptions, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor . . . against a claim of such creditor against the debtor . . . ."

[15]Section 506(a)(1) provides that "[a]n allowed claim of a creditor . . . that is subject to setoff under section 553 . . . is a secured claim . . . to the extent of the amount subject to setoff . . . and is an unsecured claim to the extent that . . . the amount so subject to setoff is less than the amount of such allowed claim."

[16]Section 542(b) provides that "an entity that owes a debt that is property of the estate . . . shall pay such debt to . . . the trustee, except to the extent that such debt may be offset under section 553 . . . against a claim against the debtor."

[17]Section 362(a)(7) provides the commencement of a bankruptcy case imposes a stay applicable to all entities, "of the setoff of any debt owing to the debtor . . . against any claim against the debtor[.]"

7

stays setoff with respect to a debt owing by any individual who is a co-obligor with the debtor or who secured such debt.[18] The Court is of the opinion that under Section 1301(a) an individual should be considered as having secured a claim owing by a debtor when the creditor has the right to fully or partially satisfy its claim through setoff against a debt owing by the creditor to such individual.[19] In this case, Section 362(a)(7) stays the Bank from exercising a right of setoff with respect to any interest of the Debtor in the CD, and Section 1301(a) stays setoff with respect to any interest of the Collins. Thus, in its motions the Bank aptly seeks relief from the stay pursuant to Sections 362(d) and 1301(c) or (d).[20] Nonetheless, considering whether the Bank is entitled to relief from the automatic stay, and how the Bank's claim and alleged right of setoff should be treated under

---

[18]Section 1301(a) provides after a case is commenced under chapter 13 "a creditor may not act . . . to collect all or any part of a consumer debt of the debtor from any individual that is labile on such debt with the debtor, or that secured such debt . . . ."

Section 1301 is entitled "Stay of action against codebtor." Use of the term "codebtor" is misleading; the term "co-obligor" would have been a better choice. A codebtor is usually thought of as the husband or wife in a joint bankruptcy case. A co-obligor is someone who is liable on the same debt as a debtor, having cosigned or guaranteed the debt, or secured the debt as an accommodation, but who is not a debtor in the same case. The word codebtor is not used in the body of Section 1301.

[19]Unlike Section 506 that applies to claims against debtors, Section 1301(a) does not specifically provide that a right to setoff a debt owing to a co-obligor by a creditor should be treated as security. Nonetheless, the purpose of the stay imposed by Section 1301 is to relieve pressure on a debtor to pay a claim outside his chapter 13 plan where such claim is a debt co-signed or guaranteed by a relative or friend. If a creditor may collect from the co-obligor the debtor will be tempted to pay that creditor and neglect payments under his plan in an effort to protect the co-obligor. A debtor will feel the same pressure to save his relatives' or friends' bank accounts as he would to save their automobiles or homes. Thus, treating a right of setoff as security with respect to Section 1301(a) serves the same purpose. *See also* Section 1322(b)(1).

[20]The Debtor's chapter 13 plan (Doc. 80) proposes to pay nothing on the Bank's claim. Accordingly, ignoring for the moment the claims of the Collins and the Trustee to the CD, it appears cause exists for relief from the stay under Sections 362(d) and 1301(c)(2).

8

the Bankruptcy Code, is premature if the contractual terms of the CD do not allow the Bank to exercise a right of setoff.

As a general rule, a legal or equitable remedy otherwise available to a party may be modified or waived by contract.[21] The Uniform Multiple-Person Accounts Act, adopted by Alabama in 1997, recognizes the application of this general rule to a depository bank's remedy of setoff against its depositor. Ala. Code § 5-24-1 *et seq* (the "UMPA Act") . Section 5-24-27 of the UMPA Act states:

> Without qualifying any other statutory right to set-off or lien and *subject to any contractual provisions between a party and a financial institution*, if any party is indebted to a financial institution, the financial institution has a right to set-off against the entire amount of the account without regard to the net contribution of the parties to the account.

Ala. Code §5-24-27 (emphasis added). Thus, according to the UMPA Act, the express terms of the CD must be given preference over any statutory right of setoff possessed by the Bank.[22]

The printed terms of the CD specifically address what conditions are to be satisfied before the Bank has a right of setoff. In the paragraph entitled WITHDRAWALS AND TRANSFERS the CD states "*[o]nly* those of *you* who sign the permanent signature card may withdraw funds from this

---

[21]*See e.g.* Ala. Code § 7-2-719 ("The agreement [for the sale of goods] may provide for remedies in addition to or in substitution of those provided in this article and may limit or alter the measure of damages . . . ."); Ala. Code § 7-2-316 ("Remedies for breach of warranty [for the sale of goods] can be limited in accordance with the provisions of this article . . . on contractual modification of remedy . . . ."; Ala. Code § 7-4-103 ("The effect of the provisions of this article [governing bank deposits and collections] may be varied by agreement . . . ."); Ala. Code § 7-3-117 ("[T]he obligation of a party to an instrument to pay the instrument may be modified . . . by a separate agreement of the obligor and a person entitled to enforce the instrument . . . .").

[22]Although the UMPA Act speaks of a statutory right to setoff being subject to modification by contract, the same principle applies to the common law right to setoff, often referred to as a banker's lien, which is defined as "[t]he right of a bank to satisfy a customer's matured debt by seizing the customer's money or property in the bank's possession."*Black's Law Dictionary* 941 (8th ed. 2004).

account." Page 2, Bank's Exh. A (emphasis added). "You" is defined under the heading DEFINITIONS as the "depositor(s)." The Court could not find any person designated in the CD as a depositor. Nonetheless, it is logical to presume the depositors are the Debtor and Mrs. Collins because their names appear on the face of the CD immediately after the phrase "This Time Deposit is Issued to."

The Court now turns to the paragraph in the CD entitled SET-OFF, that states:

> You each agree that we may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt owed to us now or in the future, by any of you *having the right of withdrawal*, to the extent of such person's or legal entity's right to withdraw.

Page 2, Bank's Exh. A (emphasis added). The only persons having the right to make withdrawals are those "who sign[ed] the permanent signature card." Mr. Collins testified that when he told the Bank's employee he wanted his Daughter's name on the CD, he was told she would have "to sign it;" however, no one testified that she actually did sign anything. In fact, the Daughter testified she never remembered signing anything related to the CD. No signature card was offered as evidence, and nothing further was presented by the Bank to rebut her testimony. Thus, the express terms of the CD allow the Bank to exercise its right of setoff only against a depositor who signed the permanent signature card, and according to the evidence, the Debtor signed no such card. The Bank's right of setoff must defer to the express terms of the CD, especially in light of the Bank being the issuer of the CD and the party who drafted its language.

The Bank's claim fails for another reason. If the Bank has a right of setoff, that remedy evolved simultaneously with the issuance of the CD because, at that time, the Debtor's loan was in default and due and payable. Hence, if the Court adopts the Bank's theory, it must treat Mr. Collins's purchase of the CD as tantamount to paying his Daughter's loan; something he never

10

Case 08-42247-JJR13    Doc 178    Filed 11/17/09    Entered 11/17/09 15:52:28    Desc
Main Document      Page 10 of 18

intended to do. The Bank is charged with knowledge of its own records relating to the Debtor's defaulted loan. There is no evidence Mr. Collins was aware of his Daughter's defaulted loan, but regardless of whether he knew about the loan, it is undisputed his intent was to implement a plan that, in his mind at least, would give his Daughter access to his money to pay bills and care for his Wife if he were incapacitated. Perhaps this was not the most prudent plan for that purpose, but a plan nonetheless he had seen work when his own father became ill. But in no event did he intend to pay his Daughter's loan. The Bank knew the source of the funds used to purchase the CD, knew the Debtor's defaulted loan was due and payable, and most important knew Mr. Collins's reason for having his Daughter's name put on the CD.

If the Bank had a right of setoff that could have been realized upon the issuance of the CD, Mr. Collins was making a crucial mistake when he had his Daughter's name put on the CD. Mr. Collins was mistaken because he did not intend to make a gift to his Daughter and pay her loan; he intended to provide for his Wife during their old age and times of poor health. Based on its loan records, the Bank knew it simply was not issuing the CD as instructed by Mr. Collins; rather it knew it was gaining a right of setoff that could be exercised at its election to pay the Debtor's loan. Hence, when Mr. Collins purchased the CD, he was making a unilateral mistake; a mistake the Bank knew he was making.

Ordinarily an unilateral mistake will not excuse enforcement of a contract against the mistaken party. But that is not necessarily the result when a party who is about to enter into a contract knows his counterpart is operating under a mistaken belief that will cause the latter to lose the benefit of his bargain and bestow a windfall on the party who knows the true state of affairs. To permit such a windfall would be to unjustly enrich the informed party.

11

In addressing a dispute involving an obviously low bid mistakenly submitted by a construction company, the Alabama Supreme Court said:

> If one of the parties, through mistake, names a consideration that is out of all proportion to the value of the subject of negotiation and the other party realizing that a mistake must have been committed, takes advantage of it and refuses to let the mistake be corrected when it is discovered, he cannot under these conditions claim an enforceable contract. Where there is a mistake that on its face is so palpable as to place a person of reasonable intelligence upon his guard, there is not a meeting of the minds of the parties, and consequently there can be no contract.

*Ex parte Perusini Const. Co.*, 242 Ala. 632, 635-36, 7 So. 2d 576, 578 (1942). Similarly, the Restatement of Contacts does not speak kindly about a party to a contract who knowingly takes advantage of another party's unilateral mistake:

> A party entering into a bargain is not bound to tell everything he knows to the other party, even if he is aware that the other is ignorant of the facts; and unilateral mistake, of itself, does not make a transaction voidable. . . . But if a fact known to one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it, a non-disclosure is not privileged and is fraudulent.

Restatement (First) of Contracts § 472 comment b (1932).

Mr. Collins intended to secure his money for his Wife's benefit in case of a medical emergency, not turnover his money to the Bank to pay his Daughter's loan. The Bank knew full well what Mr. Collins intended to accomplish. If the Court were to allow the Bank to exercise a right of setoff, the entire agreement would fail of its essential purpose. That purpose was simply for the Bank to issue a CD in return for the required deposit by Mr. Collins; the purpose was not to pay the Debtor's loan.

Perhaps it is reasonable to believe that when the Bank issued the CD it did not review its loan records which would have disclosed the Debtor's defaulted loan that gave rise to the purported right of setoff. Nonetheless, the Bank's failure to affirmatively check its own records would be

insufficient to exonerate it from being charged with knowledge that the essential purpose of the transaction would fail and thereby give the Bank an undeserved windfall. But even if the Bank's failure to consciously educate itself by reviewing its own business records would relieve it from being charged with knowledge, the result would then be that the Bank was as much mistaken as Mr. Collins. The mistake could then be accurately classified as a mutual mistake, but the result is the same:

> Mutual mistake is a defense to contract formation. Mutual mistake results when both parties to a contract share a common assumption about a vital existing fact upon which they based their bargain and that assumption is false, and because of the mistake, a quite different exchange of values occurs from the exchange of the values the parties contemplated. Under the doctrine of mutual mistake, a contract is reformable or voidable if it can be shown that the parties were both mistaken about a basic fact which is material to the agreement, but only if avoidance is just and reasonable and must not unfairly prejudice the rights of an innocent third party.

17 Am. Jur. *Contracts* § 202 (database updated May 2009) (citations omitted).

Giving the Bank the benefit of the doubt that it had no duty to affirmatively check its records will result in a mutual mistake that went to the very essence of the agreement: the agreement was no more and no less than for the Bank to issue the CD, not pay the Debtor's defaulted loan or create a right of setoff that could be exercised at a later date. The parties' agreement may be reformed to reflect what they originally intended and thereby rectify their mutual mistake by simply disallowing the Bank's right of setoff.[23]

---

[23] These facts also raise an issue regarding the consideration, or lack thereof, received by Mr. Collins in exchange for the money he gave the Bank for the CD. Apparently the Bank's position is that Mr. Collins's reason for purchasing the CD in his Daughter's name should be ignored even though the Bank was informed of his reason. If the Bank were to prevail, Mr. Collins would receive no consideration from the transaction, and lose the price he paid for the CD.

13

In summary, Mr. Collins told the Bank's employee the reason he wanted his Daughter's name on the CD. Knowing his reason, when the Bank remained silent, whether or not its silence was innocent, it waived any right to take advantage of Mr. Collins's mistake, or perhaps their mutual mistake. Accordingly, regardless of whether the Debtor signed a signature card giving her the right to make withdrawals, to avoid unjust enrichment, the Bank's motions seeking stay relief are due to be denied.[24]

*Trustee's Claim*:

The Trustee has not filed a motion for the turnover of the CD pursuant to Section 542, but in her memorandum she claims the CD is property of the Debtor's bankruptcy estate under Section 541. Indeed, the Trustee would not be wasting her time opposing the Bank's stay-relief motions and objecting to the secured status of the Bank's claim if she did not contend the CD was property of the estate.

When a bankruptcy case is commenced, the trustee steps into the shoes of the debtor, and whatever interest or rights the debtor might hold becomes property of the estate. Generally, state law determines the extent of a debtor's interest in property that may become part of the estate. *Charles R. Hall Motors, Inc. v. Lewis*, 137 F.3d 1280, 1283 (11th Cir. 1998).

Section 5-24-11(b) of the UMPA Act provides that for a multiple party account, such as the CD in this case, the ownership of the account during the lifetime of the parties is in proportion to the

---

[24]If beforehand the Bank had disclosed to Mr. Collins the CD would be in jeopardy if he put it in the name of his Daughter, then there would have been no mistake on Mr. Collins's part. Likewise, if the Daughter's loan was not in default when the CD was issued, but a right of setoff thereafter arose due to a later default, there would have been no mistake.

14

net contribution of each, unless there is clear and convincing evidence of a different intent.[25] Neither the Debtor nor her Mother made any contribution toward the purchase of the CD, and Mr. Collins testified that he did not intended to make a gift to his Daughter. Under the UMPA Act, neither the Debtor nor her Mother has an ownership interest in the CD. So who is the owner?

Under these facts the Court concludes that the Debtor was merely her Father's nominee,[26] or at most a trustee of a resulting trust for the benefit of her Mother or Father, or possibly both.[27] Section 541(b)(1) expressly excludes from the estate "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." Thus the Debtor, being her Father's nominee, does not help the Trustee's cause. And under Section 541(d) property in which a debtor holds only the legal title and not an equitable interest, does not become property of the estate to the extent of the equitable interest.[28] At most, the Debtor's interest was limited to a bare legal title, possibly shared

---

[25]"During the lifetime of all parties, an account belongs to the parties in proportion to the net contribution of each to the sums on deposit, unless there is clear and convincing evidence of a different intent." Ala. Code § 5-25-11(b).

[26]A nominee is "[a] person designated to act in place of another, [usually] in a very limited way, [or] a party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others." *Black's Law Dictionary* 1076 (8th ed. 2004).

[27]A resulting trust is "[a] remedy imposed by equity when property is transferred under circumstances suggesting that the transferor did not intend for the transferee to have the beneficial interest in the property." *Black's Law Dictionary* 1551 (8th ed. 2004).

[28]The text of Section 541(d) uses a mortgage servicer's interest in a mortgage as an example of what legal and equitable interests do, and do not become property of the estate. The legal right retained to service a mortgage becomes property of the estate, but the equitable title in a mortgage sold to a third party does not. Omitting the language pertaining to the example of what happens when a mortgage servicer become a debtor, that Section reads as follows: "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

with her Mother, but the Debtor never held any equitable interest, which always remained in her Father.[29]

In *Scoville v. U.S.*, 250 F.3d 1198 (8th Cir. 2001) the IRS sought to levy on fire insurance proceeds paid when property titled in Mrs. Scoville's name was destroyed by fire. Mrs. Schoville claimed the levy was wrongful. The IRS alleged Mrs. Schoville was a nominee for her husband who had failed to pay his taxes and had liens against all his property. The Eighth Circuit quoted the definition of a nominee found in Black's Law Dictionary's (n.26 *supra*) and held that "one who holds such title [as a nominee] has no actual interest in the property, which remains with the beneficial owner." *Scoville*, 250 U.S. at 1202. The court concluded that because Mrs. Schoville was only a nominee of the property destroyed by fire, the beneficial owner of the insurance proceeds was her husband and upheld the tax levy. *Id*. at 1203. To make a point, if under the Eighth Circuit's opinion the facts were modified such that Mrs. Schoville was the delinquent taxpayer rather than her husband, it would then logically follow that a levy on the insurance proceeds would have been wrongful because Mrs. Schoville's interest would have been limited to that of a nominee. Application of this modified version of the *Schoville* decision to the facts in the instant case demonstrates that the Trustee can realize no more from the Debtor's legal interest as a nominee of the CD than could IRS from property in which a delinquent taxpayer holds only legal title as a nominee.

The facts in this case also support a finding that Mr. Collins's purchase of the CD created a

---

[29]Since the Mother's name was placed on the CD as a depositor she also holds an interest. That interest, like the Debtor's, may only be a legal one, or it can be argued that the Mother's interest, unlike the Debtor's, was a beneficial one since Mr. Collins intended the CD to be used to support his Wife during his illness. It is not necessary to resolve the extent of Mrs. Collins' interest in the CD for the purpose of ruling on the matters before the Court.

16

Case 08-42247-JJR13    Doc 178    Filed 11/17/09    Entered 11/17/09 15:52:28    Desc
Main Document    Page 16 of 18

resulting trust in which either he or his Wife, or possibly both, were the intended beneficiaries. The Restatement of Trusts states the universally accepted rule for the establishment of a resulting trust:

> (1) Except as stated in Subsection (2), where a transfer of property is made to one person and the purchase price is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid . . . .
>
> (2) Where a transfer of property is made to one person and the purchase price is paid by another and the transferee is a spouse, descendant, or other natural object of the bounty of the person by whom the purchase price is paid, a resulting trust does not arise unless the latter manifests an intention that the transferee should not have the beneficial interest in the property.[30]

Without taking into consideration Mr. Collins's unequivocal announcement when he purchased the CD that he was not making a gift to his Daughter, the Restatement would not treat the transfer of Mr. Collins's money to his Daughter via the CD as creating a resulting trust. However, Mr. Collins's proclamation that he was not making a gift to his Daughter was a sufficient manifestation of his intent to keep the transaction within the general rule for the creation of a resulting trust.

Inasmuch as the Debtor did not sign a signature card allowing her to make withdrawals from the CD, neither can the Trustee make withdrawals as the Debtor's successor. Also, in the paragraph entitled PRIMARY AGREEMENT the CD provides that "You must present this certificate when you request a withdrawal or a transfer." The Debtor could not present the CD for a withdrawal because she never had it in her possession; the CD has always been in the possession of her Father. The Father has no obligation under Section 541(a) to turn over the CD to the Trustee because it is not property of the estate. Thus, when the Trustee succeeded to the Debtor's position vis-a-vis the

---

[30] Restatement (Third) of Trusts § 9 (2003).

Case 08-42247-JJR13    Doc 178    Filed 11/17/09    Entered 11/17/09 15:52:28    Desc Main Document      Page 17 of 18

CD, she never gained the right to withdraw funds. And even if the Trustee was able to make withdrawals, she could not usurp Mr. Collins's beneficial and equitable title to the CD.

Accordingly, for the reasons stated in this Opinion and in conformity herewith, an Order will be entered pursuant to Rule 9021:

(A) Denying the Bank's Motion For Relief From Stay (Doc. 65);

(B) Denying the Bank's Motion for Relief From Co-Debtor Stay (Doc. 74);

(C) Sustaining the Trustee's Objection to Motion For Relief From Stay (Doc. 129);[31] and

(D) Sustaining the Trustee' Objection to secured status of Claim 10 of the Bank (Doc. 131).

Dated: November 17, 2009

/s/ James J. Robinson
JAMES J. ROBINSON
United States Bankruptcy Judge

---

[31] The Trustee's objection to the stay relief sought by the Bank is being sustained, not because of any interest of the Trustee or the estate in the CD, but rather because the Bank has no right to exercise a right of setoff with respect to the CD. The Court could have just as well ruled that the Trustee's objection to the to the stay relief was moot.